IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHRISTIAN AQUILA, and | : | CIVIL ACTION |
| MELINA DOBRIKOVIC-AQUILA | : | |
| and CHRISTIAN AQUILA, JR., a minor | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | NO.  07-2696 |
| | : | |
| NATIONWIDE MUTUAL | : | |
| INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE                                   December     15, 2008
UNITED STATES MAGISTRATE JUDGE

I.     **Introduction**

Plaintiff Christian Aquila, Sr. ("Aquila Sr.") brought this action against Defendant Nationwide Mutual Insurance Company (alternatively "Nationwide" or "Defendant").    The complaint was filed in the United States District Court for the Eastern District of Pennsylvania and assigned to the Honorable Anita B. Brody.[1]   On May 9, 2008, 2008, the parties consented to Magistrate Judge jurisdiction and the matter was transferred to this Court.  (Doc. 48).  By a second amended complaint filed on August 20, 2008 (Doc. 68), Milena Dobrikovic ("Dobrikovic"), the former wife of Aquila Sr. (collectively "Plaintiffs"), and their son Christian Aquila Jr. ("Aquila Jr."),

---

[1]   Subject matter in this case is predicated upon diversity of citizenship under 28 U.S.C. § 1332.  (*See* Doc. 68 ¶ 6).  Under *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938), a federal court must apply the substantive laws of its forum state in diversity actions.  *See Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 614 (3d Cir. 1992).  Accordingly, we apply Pennsylvania law in deciding all substantive legal issues pertaining to this case.

were added as Plaintiffs.[2]

Presently before the Court is Nationwide's motion (Doc. 75) pursuant to Fed. R. Civ. P. 56(b) arguing that it is entitled to judgment as a matter of law on the claims asserted by Aquila Sr. and Dobrikovic. Noting that Plaintiffs have failed to respond, we nonetheless consider the motion on its merits. For the reasons set out below, we will enter an Order granting summary judgment in part in Nationwide's favor upon all claims asserted within Count One, upon all claims asserted by Dobrikovic within Count Two, and upon all claims, save for one, asserted by Aquila Sr. within Count Two.

## II.    Factual Background[3]

Aquila Sr. and his former wife, Milena Dobrikovic ("Dobrikovic") were the owners of a 2002 Nissan Pathfinder (the "Vehicle") which had been insured by Nationwide through an insurance policy (the "Policy") which included losses by theft. (*See* Policy attached to Doc. 75 at Ex. 9). On or about September 26, 2005, the Vehicle was stolen from a street-side parking spot on the 700 block of Packer Avenue in Philadelphia. (*See* Philadelphia Police Department Incident Report attached to Doc. 75 at Ex. 5, pg. 301). Aquila Sr. had been at work as a food concessionaire in the city's Citizens Bank Park at the time of the theft. (*See* Aquila Sr.'s recorded interview attached to Doc.

---

[2] The claims asserted by Aquila Jr. were the subject of a separate motion filed by Nationwide pursuant to Fed. R. Civ. P. 12(b)(g), 12(e), and 12(f) to dismiss or, alternatively, strike. (Doc. 69). We granted dismissal of all claims asserted by Aquila Jr. on November 13, 2008. (Doc. 86).

[3] The summary judgment record before us contains undisputed facts, factual allegations as set out in the Plaintiffs' second amended complaint (many of which, we note, Nationwide has not disputed), facts presented by Nationwide which are properly supported and not disputed by Plaintiffs, and deposition transcripts, policy documents and expert reports provided as exhibits to Nationwide's motion.

75 at Ex. 5, pp. 199-201).  Upon his discovery of the missing Vehicle, Aquila Sr. promptly reported

the incident to the Philadelphia Police and to Nationwide.  (Doc. 1, ¶¶ 10-11).  The police located

the Vehicle two days later in the Cobbs Creek area of the city.  (*See* Doc. 71 at Ex. 5, pg. 301).  It

had been seriously vandalized and burned.  (Doc. 1, ¶ 12).

Upon the subsequent discovery of the Vehicle's condition, Aquila Sr. "made a claim for

replacement cost" to Nationwide (the "Claim").  (Doc. 1, ¶ 13).  The Claim was referred to Barbara

Grabowski, one of Nationwide's claims-handling representatives, and to Adam Marakovits

("Marakovits"), a Nationwide claims investigator.  (Doc. 1, ¶ 14).  Marakovits subsequently

undertook an investigation (the "Investigation") of the incident.  (Doc. 1, ¶ 17).  It is the

Investigation which forms the basis of the second amended complaint.

Plaintiffs allege that over the course of the Investigation, Marakovits attempted "to harass

and to intimidate the Plaintiffs" (Doc. 1, ¶ 17) and made various demeaning comments and

insinuations about Aquila Sr. to him and his wife, as well as to Jeanann Dobrikovic (Dobrikovic's

mother) ("Jeanann").  Specifically, Plaintiffs allege that Marakovits accused Aquila Sr. of insurance

fraud, contacted Jeanann to assert that Aquila Sr. "was of 'shady' character," and generally implied

that Aquila Sr. "had acted in such a manner as to cause the theft of [the Vehicle] for purposes of

disposing of [the Vehicle] and collecting the insurance proceeds to pay off the loan on [the Vehicle]"

(Doc. 1, ¶ 18).  Plaintiffs also assert that Marakovits insisted that Aquila Sr. produce certain financial

records including tax returns, payroll records, credit card payments, and "generally acted in such a

manner as to accuse [Aquila Sr.] of acting in a criminal manner.  (Doc. 1, ¶ 19).

Plaintiffs likewise assert that Marakovits, over the course of the investigation, contacted

Dobrikovic and "demanded that she produce herself for the purposes of a deposition" so as to "harass

3

and intimidate" her and Aquila Sr. and to "cause them to abandon" the Claim.  (Doc. 1, ¶ 20).  They further allege that Marakovits continued to telephone her "in an effort to . . . cause dissension" between her and Aquila Sr.  (Doc. 1, ¶¶ 20-21).  Marakovits allegedly "thereafter made it known to others that he suspected that [Aquila Sr.] had committed a criminal act during the time period in which the vehicle had been stolen, that [Aquila Sr.] made a false claim and that [] Marakovits was convinced that he would uncover evidence of the criminal act of [Aquila Sr.]."  (Doc. 1, ¶ 24).  It is also asserted that Marakovits told Dobrikovic "that his investigation uncovered criminal and fraudulent acts committed by" Aquila Sr.  (Doc. 1, ¶ 24).  Although Plaintiffs fail to specify the dates on which these various communications occurred, the evidence of record reveals that the final date upon which any of these communications could have occurred was, according to Dobrikovic, in "the beginning of May [2006]" and before Aquila Jr.'s birthday on May 27.  (*See* Doc. 75 at Ex. 3, pp. 30, 33, 39-40).  No witness recalled any communication with any Nationwide representative after that.  (*See* Doc. 75 at Ex. 2, pg. 64; Ex. 3, pg. 33; Ex. 4 at pg. 15).

The Investigation was closed on April 19, 2006 with a determination that the Claim would be paid.  (*See* Doc. 75 at Ex. 5, pg. 55).  Nationwide then provided Aquila Sr.'s counsel with appropriate claim settlement documents, along with its monetary evaluation, on April 24, 2006. (*See* Doc. 75 at Ex. 5, pg. 54; Ex. 19).  It then issued payment in the amount of $18,593.78 on May 12, 2006 (*see* Doc. 75 at Ex. 5, pg. 49).  Nationwide also issued a subsequent payment to Aquila Sr. in the amount of $1,578.30 on May 26, 2006, as compensation for amounts owed as a result of Aquila Sr.'s payment of insurance premiums upon the Vehicle during the course of the Investigation.  (Doc. 75 at 25; *see also* Ex. 21).  Aquila Sr. signed the check and deposited or cashed it on June 1, 2006. (Doc. 75 at Ex. 21).

4

We do not read Nationwide to contradict the factual allegations regarding the manner of the Investigation and the alleged communications made by Marakovits.  Nationwide asserts, however, and Plaintiffs do not dispute, that the Investigation was prompted by the existence of several "red flags."  (*See infra* at 15-16).  Nationwide further asserts that any delay in the eventual payment of the Claim was due, initially, to the Investigation and, subsequently, to Plaintiffs' failures to comply with routine documentation requests.  Nationwide finally asserts that basis for its valuation of the Vehicle's value (a 16 page report prepared by "CCC Valuescope") was reasonable and that all amounts properly due to Aquila Sr. under the terms of the Policy were paid.  In that Plaintiffs have failed to respond to these adequately supported assertions, we accept them as true.  (*See infra* at 7-8).

## III.    Procedural History

By his complaint, Aquila Sr., as owner of a vehicle insured by Nationwide, alleged claims against Nationwide for libel and slander (Count I); bad faith (Count II); and violation of 42 U.S.C. § 1983 (Count III).  On September 4, 2007, Nationwide filed a motion to dismiss Count III of the complaint.  (Doc. 3).  Judge Brody granted the motion on December 5, 2008.  (Doc. 17).

Upon transfer of the matter to this Court by the consent of the parties, counsel for Aquila Sr. filed motions seeking leave to file an amended complaint on June 8, 2008 and June 10, 2008 (Docs. 52 & 53), which we granted on July 17, 2008 (Doc. 57).  Counsel for Aquila Sr., in turn, filed a first amended complaint on July 22, 2008.  (Doc. 58).   On July 30, 2008, Nationwide filed a motion pursuant to Fed.R.Civ.P. 12(e) for a more definite statement.  (Doc. 60).  Following an August 15, 2008 recorded telephone conference with the Court (Doc. 67) and discussion about the claimed deficiencies in the first amended complaint, Aquila Sr.'s counsel stated that he would address the deficiencies with a second amended complaint.  This pleading was filed on August 20, 2008 (Doc.

68).  Like the first amended complaint, it added Dobrikovic and Aquila Jr. as Plaintiffs to Count I; Dobrikovic as Plaintiff to Count II; and a new Count III asserting a "claim of bad faith damages" naming only Aquila Jr. as Plaintiff.

Nationwide then filed this motion (Doc. 75) pursuant to Fed. R. Civ. P. 56(b) on October 3, 2008 seeking summary judgment on the claims asserted by Aquila Sr. and Dobrikovic in the second amended complaint.  Pursuant to our scheduling order of September 10, 2008, any response was due by October 10, 2008.  (*See* Doc. 70).  Plaintiffs failed to respond.[4]  The motion is now ripe for our review.  For the reasons set out below, we will grant in part Defendant's motion and enter judgment as a matter of law upon all claims asserted by Dobrikovic and all claims asserted by Aquila Sr., save for one.[5]

## IV.    Legal Standard

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate where "the pleadings, the

---

[4] At the pre-trial conference held in open court on October 29, 2008, Plaintiff's counsel informed the Court of his intention to file an untimely response to the motion.  (See N.T. 10/29/08 at 3: "MR. MARCONE: You don't have an answer yet on the summary motion.  I am working on that and I hope to have it today, but something came up which - - and I'll explain it - - but I . . . should have it tomorrow.").  We were not asked if we would permit such a filing out of time.  In any event, as of the date of this Order, no response has been filed.

[5] Amended pleadings are governed by Fed.R.Civ.P. 15.  Once a plaintiff files an amended complaint it is well settled that the amended pleading supercedes and renders moot the initial complaint.  *See, e.g., Washer v. Bullitt County*, 110 U.S. 558, 562 (1884); *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1504 (3d. Cir. 1996) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) and noting the "general principle that the amended complaint 'supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading'"); *Panton v. Matlack*, No. 06-0809, 2007 U.S. Dist. LEXIS 92003, *7 (M.D.Pa. Dec. 14, 2007) ("It is well-settled that an amended complaint supersedes the original complaint.").  In that the second amended complaint nowhere purports to "specifically refer to or adopt" either of the prior complaints, we proceed only upon the claims raised in the second amended complaint.

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The moving party bears the initial burden of demonstrating the absence of a genuine issue of any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has done so, the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the responding party must "set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587 (citation omitted).  Finally, only factual disputes "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  Factual disputes which are "irrelevant or unnecessary" to a proper consideration of the case under applicable law are insufficient to preclude a grant of summary judgment.  *See id.*

As set out above, Plaintiffs failed to file a response to the motion.  Nonetheless, pursuant to Local Civil Rule 7.1(c), motions seeking summary judgment to which the nonmoving party has failed to respond remain governed by Fed.R.Civ.P. 56(c), and may not simply be granted as unopposed.  In this circumstance, the reviewing court is naturally "limited to a consideration of the pleadings filed by the parties and the exhibits filed by" the moving party.  *Abbdulaziz v. City of Philadelphia*, Civ. A. No. 00-5672, 2001 U.S. Dist. LEXIS 16972, *7 (E.D. Pa. Oct. 18, 2001), *aff'd*, 47 Fed. Appx. 131 (3d Cir. 2002)  By failing to respond to the motion, however, "the nonmoving

party waives the right to respond to or to controvert the facts asserted in the summary judgment motion." *Reynolds v. Rick's Mushroom Serv.*, 246 F. Supp. 2d 449, 453 (E.D. Pa. 2003) (quoting *Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002)); *see also Santana v. City of Philadelphia*, Civ. A. No. 07-1657, 2008 U.S. Dist. LEXIS 53229, *3 (E.D. Pa. July 11, 2008) (quoting *Reynolds* for same proposition). The reviewing court, thus "should accept as true all material facts asserted and properly supported in the summary judgment motion." *Reynolds*, 246 F. Supp. 2d at 453 (quotation omitted).

## V.     Discussion

In its motion, Defendant seeks summary Judgment upon the claims asserted by both Aquila Sr. and Dobrikovic in Counts One and Two of the amended complaint. We address Defendant's motion as it pertains to each individual count, in turn.

### A.     Count One: Libel and Slander

Plaintiffs, including Aquila Jr. have asserted under Count One of the second amended complaint a claim for libel and slander. Pennsylvania law provides for a one year period of limitation for the bringing of a defamation action. *See* 42 Pa.C.S.A. § 5523(1). The cause of action accrues, and the limitations period thus begins to run, on the date of publication of the alleged defamatory statements. *See Easton v. Bristol-Myers Squibb Co.*, 289 F. Supp. 2d 604, 613 (E.D. Pa. 2003) (citation omitted). Nationwide asserts that the claim brought by Aquila Sr. and Dobrikovic was filed after the one year limitations period expired and that it is thus entitled to judgment as a matter of law upon Count One. (Doc. 75 at 8). Nationwide is right.

Plaintiffs fail to set out in the second amended complaint the date upon which the alleged defamatory statements were published. It is clear from the face of the pleading, however, that as to

the purported slander, only three recipients of the publication are alleged: Aquila Sr., Dobrikovic, and Jeanann. With respect to Aquila Sr., Nationwide asserts, and Plaintiffs nowhere dispute, that Nationwide had no contact with Aquila Sr. after October 27, 2005, the date on which Attorney Frank Marcone, Esquire notified them that he would be representing Aquila Sr. for the purposes of the Claim. (Doc. 75 at 7). The evidence of record, including Nationwide's claims log, supports this assertion. (*See* Doc. 75 at Ex. 5, pg. 180 and at Ex. 7).

With respect to Dobrikovic, she testified at her deposition that the only Nationwide representative with whom she ever had any communication was Marakovits. (Doc. 75 at Ex. 3, pp. 18, 29-30). She testified to a specific recollection of a conversation with Marakovits on April 4, 2006, which is confirmed by Nationwide's claims log (*see* Doc. 75 at Ex. 5, pg. 74), and testified to a general recollection of "a few" (*see* Doc. 75 at Ex. 3, pg. 33) more direct communications with Marakovits in "the beginning of May [2006]" and before her son's birthday on May 27 (*see* Doc. 75 at Ex. 3, pp. 30, 33, 39-40), but did not recall any communication with Marakovits after that point (*see* Doc. 75 at Ex. 3, pg. 33). Aquila Sr. did not contradict her assertions in his own deposition (*see* Doc. 75 at Ex. 2, pg. 64), and Plaintiffs do not do so in any of their papers.

With respect to Jeanann, she also testified at her deposition that the only Nationwide representative with whom she ever had any communication was Marakovits. (*See* Doc. 75 at Ex. 4, pp. 14-15). She testified to a specific recollection of only a single conversation with Marakovits on November 7, 2005 (*see* Doc. 75 at Ex. 4, pg. 15), a date which is confirmed by Nationwide's claims log (*see* Doc. 75 at Ex. 5, pg. 175). She stated that she had no recollection of any communication with Marakovits after that. (*See* Doc. 75 at Ex. 4, pg. 15). Neither Aquila Sr. nor Dobrikovic contradicted her assertions. (*See* Doc. 75 at Ex. 2, pg. 74; Ex. 3).

We additionally note that Nationwide's claims log reveals that Marakovits closed the Investigation on April 19, 2006 (*see* Doc. 75 at Ex. 5, pg. 55), that Nationwide provided Aquila Sr.'s counsel with appropriate claim settlement documents, along with its monetary evaluation of the Claim, on April 24, 2006 (*see* Doc. 75 at Ex. 5, pg. 54; Ex. 19), and that Nationwide issued payment in the amount of $18,593.78 on May 12, 2006 (*see* Doc. 75 at Ex. 5, pg. 49). While it is difficult, with the absence of a specific assertion, to see how any defamatory communication regarding Plaintiffs may have been made at any time after the Claim was resolved from Nationwide's perspective, we accept on Dobrikovic's deposition evidence that there could have been a publication to her as late as May 27, 2006. Even if this were so, however, Plaintiffs would have had only until May 27, 2007 to bring an action for libel or slander. *See* 42 Pa.C.S.A. § 5523(1). Aquila Sr. first brought his claim on June 22, 2007, and Dobrikovic first brought her claim on July 22, 2008. Both claims are plainly untimely.[6] They are thus barred by the Pennsylvania statute of limitations. Nationwide is entitled to judgment as a matter of law on this Count.

**B.    Count Two: "Actions Constituting Bad Faith in Violation of the Law by an Insurance Company"**

Plaintiffs have asserted under Count Two of the second amended complaint a claim against Nationwide for "actions constituting bad faith in violation of the law." (Doc. 68 at 14). Although Plaintiffs fail to specify "the law" which Nationwide's actions are allegedly violative of, they do

---

[6] In reaching this conclusion, we do not pass upon the question of whether Dobrikovic's claim would somehow relate back to Aquila Sr.'s initial complaint in that the claim would remain untimely even if it did. It is the case, however, that Plaintiffs fail to assert, and indeed provide no evidence for the proposition, that any communication allegedly made by Nationwide specifically regarded Dobrikovic herself. *See Beverly Enters. v. Trump*, 182 F.3d 183, 187 (3d Cir. 1999) (citing 42 Pa. C. S. § 8343(a)). Accordingly, Nationwide would be entitled to summary judgment on this alternative basis.

specify that they seek both compensatory and punitive damages, "including attorney's fees and costs related thereto."  (Doc. 68 at 14, ¶ 47).  We, in turn, construe them to assert both a common law contract action for a breach of the general "obligation to act in good faith" inherent in every contract, *The Birth Center v. The St. Paul Cos.*, 787 A.2d 376, 385 (Pa. 2001), and a statutory claim under Pennsylvania's bad faith statute, 42 Pa.C.S. § 8371.[7]

---

[7] The bad faith statute provides, in full:

§ 8371.  Actions on insurance policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

In *The Birth Center*, the Pennsylvania Supreme Court determined that while the plain language of the statute did not provide for the recovery of compensatory damages, neither did it foreclose a plaintiff from recovering such damages.  787 A.2d at 402-03.  The plain language of § 8371, the court held, instead "merely provides an additional remedy and authorizes the award of additional damages."  *Id.* at 402.  The court further clarified that the compensatory damages to which § 8371 damages are "additional" stem from an insured's "common law contract rights" which pre-existed the bad faith statute (enacted in 1990) – specifically the common law "obligation to act in good faith" inherent in every contract.  *Id.* at 385, 402.  This common law obligation can be traced at least as far back as 1959, when the Pennsylvania Supreme Court decided in *Cowden v. Aetna Casualty & Surety Co.* that the "greatly preponderant weight of authority in this country" provided an insured with a cause of action if the insurer's "handling of the claim . . . was done in such a manner as to evidence bad faith on the part of the insurer in the discharge of its contractual duty."  134 A.2d 223, 227 (Pa. 1959).

With this in mind, we are thus able to properly categorize Plaintiffs' claims by examining the relief which they seek.  To the extent that Plaintiffs seek an award of compensatory damages, we construe them to assert a common law breach of contract action.  To the extent that they seek punitive damages and attorney's fees, we construe them to assert an action under § 8371.  While we find it important for the sake of housekeeping to properly delineate the claims asserted, we

(continued...)

To establish a claim for bad faith, a plaintiff is required to demonstrate "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997). While neither § 8371 nor the Pennsylvania Supreme Court definitively establish a single definition of bad faith, the Third Circuit adopted the definition set out by the Pennsylvania Superior Court in *Terletsky*:

> 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (quoting *Terletsky*, 649 A.2d at 688).[8]

Importantly, a plaintiff is required to prove these elements not by the usual preponderance

---

[7](...continued)
note that the same evidentiary standard of determining whether an insurer acted in bad faith applies to both claims – an insured must prove that the insured acted in bad faith by "clear and convincing evidence." *Compare Cowden*, 134 A.2d at 229 (pertaining to bad faith under a common law breach of contract cause of action) *with Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1188 (Pa. Super. Ct. 2007) (citing *Terletsky v. Prudential Property & Casualty Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (pertaining to bad faith under a § 8371 cause of action). We note, further, the absence of any suggestion that the elements necessary to establish either claim may differ in any way.

[8] Although the Third Circuit in *Klinger* predicted that the Pennsylvania Supreme Court would not require a plaintiff to prove, as a third element, a "dishonest purpose" or a "motive of self-interest or ill will," *see* 115 F.3d at 234, it subsequently determined in *Babayan*, in an apparent reversal of position, that a plaintiff indeed "must ultimately show that 'the insurer breached its duty of good faith through some motive of self-interest or ill will.'" 430 F.3d at 137. Resolution of these cases, however, is unnecessary to our disposition of this motion.

of the evidence standard applied in most civil actions, but by clear and convincing evidence. *See Babayan*, 430 F.3d at 137 (citing *Terletsky v*, 649 A.2d at 688). This places a heavier burden upon a plaintiff, and requires a plaintiff to come forward with "evidence that is 'so clear, direct, weighty and convincing' that one could reasonably find against the defendant insurer 'without hesitancy' and 'with a clear conviction.'" *Kubrick v. Allstate Ins. Co. (In re Estate of Kubrick)*, 2004 U.S. Dist. LEXIS 358, *38 (E.D. Pa. 2004) (quoting *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 752 (3d Cir. 1994) and *U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir. 1985)).

At the summary judgment stage, this means that "the insured's burden in opposing a summary judgment motion brought by the insurer is 'commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial.'" *Babayan*, 430 F.3d at 137 (citation omitted). In other words, "in order to defeat a motion for summary judgment, a plaintiff must show that a jury could find by the stringent level of clear and convincing evidence, that the insurer lacked a reasonable basis for its handling of the claim and that it recklessly disregarded its unreasonableness." *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 571 (E.D. Pa. 2000) (internal quotation omitted). On the other hand, in that "the essence of a bad faith claim is the denial of coverage without good reason," it follows that "an insurer is entitled to summary judgment if it can show a reasonable basis for its actions." *Rock-Epstein v. Allstate Ins. Co.*, 2008 U.S. Dist. LEXIS 76042, *17 (E.D. Pa. Sep. 29, 2008) (citing *Jung v. Nationwide Mut. Fire. Ins. Co.*, 949 F. Supp. 353, 360 (E.D. Pa. 1997); *Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578, 581 n.3 (E.D. Pa. 1998)).

We are also mindful, however, that an action seeking remedy pursuant to § 8371 "applies only in limited circumstances--i.e., where the insured first has filed 'an action arising under an

13

insurance policy' against his insurer" and, in turn, "only permits a narrow class of plaintiffs to pursue the bad faith claim against a narrow class of defendants." *Ash v. Cont'l Ins. Co.*, 932 A.2d 877, 882 (Pa. 2007) (citation omitted). Specifically, a § 8371 claim presupposes the existence of "a claim an insured has made of his insurer," *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 200 (Pa. 2007), and thus only the "insured" engaged in the bringing of a claim against his insurer may bring this claim. *See Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 530 (3d Cir. 1997) (determining that "[a]bsent a predicate action to enforce some right under an insurance policy, an insured may not sue an insurer for bad faith conduct in the abstract."). In other words, in order to fit into the "narrow class of plaintiffs" permitted to bring a claim pursuant to § 8371, *Ash*, 932 A.2d at 882, a plaintiff must, first, qualify as an "insured" under an insurance policy and, second, have actually made a claim "of his insurer." *Toy*, 928 A.2d at 200.

Although apparently an "insured" under of the Policy, Nationwide asserts that Dobrikovic never made a claim for the theft of the Vehicle and that it is the case, rather, that only Aquila Sr. made such a claim. (Doc. 75 at 28). We are unable to find any evidence within the record to the contrary, and accept the assertion as true. Given this circumstance, it is clear that Dobrikovic does not qualify into the "narrow class of plaintiffs" permitted to bring a § 8371 claim. *Ash*, 932 A.2d at 882. As such, Nationwide asserts that it is entitled to judgment as a matter of law upon the bad faith claims asserted by Dobrikovic on this basis. (Doc. 75 at 28-29). We agree.

The remainder of our discussion here addresses only the remaining claims brought by Aquila Sr. There appear to be four primary substantive components to the claims contained in Count Two of the amended complaint: (1) Nationwide unreasonably conducted an investigation into the claim; (2) Nationwide improperly delayed payment of the Claim; (3) Nationwide, when it finally settled the

14

claim, paid less than the full amount that Plaintiffs were otherwise entitled to; and (4) Nationwide conducted the Investigation in an unreasonable manner.[9]  We address each component in turn to determine whether Aquila Sr. puts forward sufficient evidence – evidence that could satisfy the clear and convincing standard – to create a material issue for trial.  Conversely, where Nationwide is able to proffer "a reasonable basis for its actions" *Rock-Epstein*, 2008 U.S. Dist. LEXIS 76042 at *17, it will meet its burden of demonstrating that there exists no genuine issue for trial and will be entitled to judgment as a matter of law.

### 1.      Decision to Investigate

We understand Aquila Sr. to assert that the Investigation "was unnecessary."  (Doc. 68 at 4, ¶ 17).  We examine this aspect of Nationwide's motion to determine specifically whether Nationwide is able to "show a reasonable basis for" conducting the Investigation.  *Rock-Epstein*, 2008 U.S. Dist. LEXIS 76042 at *17.  If Nationwide can do so, then it will demonstrate an absence of any genuine issue for trial and is entitled to judgment as a matter of law.  *Id.*

We note from the outset that Pennsylvania statutory law requires insurers to develop and implement antifraud plans and to report annually their efforts to combat insurance fraud to the Pennsylvania Insurance Department (the "PID").  *See* 75 Pa.C.S. §§ 1811, 1814.  The PID, in turn, audits insurers to determine whether they are making satisfactory efforts to curb insurance fraud – insurers who fail in this regard are subject to significant regulatory penalties, including fines of up to $10,000.  *See* 75 Pa.C.S. §§ 1813, 1815.  Perhaps most significantly, the regulations place an affirmative duty upon insurers to establish specific procedures to "review claims in order to detect

---

[9] For the sake of housekeeping, we observe that only the third component appears to seek compensatory damages.  We assume that this component makes up Aquila Sr.'s common law breach of contract action while the others make up Aquila Sr.'s § 8371 cause of action.

evidence of possible insurance."  75 Pa.C.S. § 1815.

Against this statutory backdrop, it comes as no surprise that courts applying Pennsylvania law have determined that an insurer meets its burden of showing "a reasonable basis" for investigating a claim, and is thus entitled to judgment as a matter of law, where it demonstrates the existence of certain "red flags" which prompted it to further investigate an insured's claim.  *See Brown v. Liberty Mut. Ins. Group*, 2001 U.S. Dist. LEXIS 781, *8-11 (E.D. Pa. Jan. 30, 2001); *Sheare v. State Farm Mut. Auto. Ins. Co.*, 56 Pa. D. & C.4th 503, 509-12 (2002); *Sanders v. State Farm*, 47 Pa. D. & C.4th 129, 139-42 (2000).  Nationwide asserts the existence of several such red flags here which, it argues, serve to justify its undertaking the Investigation and, in turn, entitle it to judgment as a matter of law.  (Doc. 75 at 11).

Specifically, Nationwide points to the existence of nine red flags which, it asserts, entitles it to:

(1) The Vehicle had been stolen despite its being equipped with a factory installed transponder anti-theft device.

(2) The Vehicle had been recovered burned, such that it was a total loss.  (*See* Doc. 75 at Ex. 5, pp. 221, 201).

(3) One of two keys to the Vehicle, which contained the embedded and specifically coded microtransmitter that could start the Vehicle, could not be accounted for as of September 28, 2005 (it was reportedly in Dobrikovic's possession, and neither Aquila Sr. nor Nationwide could reach her, although her key had been accounted for as of October 13, 2005).  (*See* Doc. 75 at Ex. 5, pp. 235, 201, 199).

(4) An October 10, 2005 examination of the 700 block of Packer Avenue, the reported theft location, revealed that there were no legal parking spaces or even a shoulder upon which to park a vehicle at that location.  Aquila Sr. nonetheless subsequently re-affirmed his contention that the Vehicle had been parked at that location.  (*See* Doc. 75 at Ex. 5, pp. 204, 201).

(5) Aquila Sr.'s financial records as of October 21, 2005 revealed that his monthly expenses

16

(including the minimum payments due on his open credit card account balances, $550 in child support and $550 in alimony) exceeded his monthly income by approximately $157, and that he had additional car loan payments of approximately $421 per month. (*See* Doc. 75 at Ex. 5, pp. 193; 201). Further, Aquila Sr. informed Nationwide in an October 13, 2005 recorded interview that he had tried unsuccessfully to sell the Vehicle in July 2005 for $19,000. (*See* Doc. 75 at Ex. 5, pg. 201).

(6) An October 25, 2005 report completed by North American Technical and Forensic Services, Inc. ("NATS") pursuant to an October 6, 2005 examination concluded "with a high degree of scientific certainty" that the Vehicle's "ignition lock, column lock and starter switch assembly had not been forced, defeated, or otherwise compromised and nothing, other than a key of the proper type, containing the correct transponder, had been used to start and operate this vehicle." (Doc. 75 at Ex. 10, pg. 5).

(7) The same NATS report revealed that while the Vehicle was missing its radiator and a headlight component, other oft-stolen items such as the stereo, rims, tires, battery and airbags had not been removed. (*See* Doc. 75 at Ex. 10, pp. 3-4).

(8) As of October 27, 2005, Aquila Sr. had yet to return the basic vehicle theft package necessary for Nationwide to process the Claim which had been sent to him approximately a month earlier, despite three separate letters having been sent to him requesting that he send the necessary information. (*See* Doc. 75 at Ex. 15, pp. 235-36; Ex. 13).

(9) As of October 27, 2005 (and at least until January 4, 2006), Dobrikovic had failed to respond to Nationwide's communications seeking to determine whether she had possessed one of the Vehicle's two keys on the date of the theft. (*See* Doc. 75 at Ex. 15, pp. 235-36; Ex. 16).

(Doc. 75 at 10-13).

In that Aquila Sr. has not responded to this motion, we do not understand them to challenge the existence of these red flags. We accept these assertions, which are supported by appropriate exhibits, as true. We are, in turn, satisfied that Nationwide has established a reasonable justification for undertaking the Investigation.[10]  As such, to the extent that this claim asserts bad faith in the

---

[10] We recognize that Aquila Sr. has submitted expert reports from Thomas Bishop and Thomas Tuohey (copies of which are attached as Exhibits B and C, respectively, to Nationwide's pending *Daubert* motion challenging the admissibility of both at trial), both of whom purport to testify to the existence of a method by which car thieves are able to steal cars armed, as the

(continued...)

decision to undertake the Investigation, Nationwide is entitled to judgment as a matter of law.  *See Brown*, 2001 U.S. Dist. LEXIS 781 at *8-11; *Sheare*, 56 Pa. D. & C.4th at 509-12; *Sanders*, 47 Pa. D. & C.4th at 139-42.

### 2.    Improper Delay

Nationwide also asserts that it is entitled to judgment as a matter of law upon this claim to the extent that Plaintiffs allege bad faith due to an improper delay in payment.  While we do not read Aquila Sr. to directly assert an improper delay as an independent basis for their bad faith claim, to the extent that they do, we note that delay "may be a relevant factor in determining whether an insurer has acted in bad faith." *Williams*, 83 F. Supp. 2d at 572 (citation omitted).  It is well-settled, however, that "a long period of time between demand and settlement does not, on its own, necessarily constitute bad faith." *Williams*, 83 F. Supp. 2d at 572 (citation omitted).  Delay itself, is only deemed relevant to the extent that "a defendant insurer *knew* that it had no basis to deny the claimant." *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 589 (E.D. Pa. 1999).  Importantly, even where all delay may be attributable to the insurer, *see Quaciari*, 998 F. Supp. at 583, so long as the "delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred." *Kosierowski*, 51 F. Supp. 2d at 589 (citing *Klinger*, 115 F.3d at 234; *Quaciari*, 998 F. Supp. at 582-83 and *Grove v. Aetna Cas. & Sur. Co.*, 855 F. Supp. 113, 115 (W.D. Pa. 1993)).

There is no dispute here that the initial cause of the delay in payment of the Claim was

---

[10](...continued)

Vehicle had been, with a transponder ignition.  (*See* Doc. 74-2 at Exs. B & C).  Even accepting those reports however, and even accepting the extended implication that Nationwide knew or should have known about the method by which the Vehicle may have been stolen, this negates, at most, the first, third, and sixth red flags. This leaves six red flags unaccounted for, and ignores the pertinent question here – namely, whether Nationwide had a reason for carrying on the Investigation in the first instance.

Nationwide's Investigation; an investigation which, we have determined, was justified by the existence of several red flags.  Moreover, Aquila Sr. fails to show that a genuine issue of material fact exists as to the cause of any delay which Nationwide asserts is attributable to Plaintiffs' own actions and/or the actions of their counsel through their failure to appear for routine examinations under oath and in failing to return routine theft claim document packets.  These assertions, which are not contradicted and are properly supported by adequate exhibits, make clear that there is no genuine issue as to the question of responsibility for the delays.  (*See* Doc. 75 at 14-20 & Exs. 2, 3, 5, 8, 9, 11, 13, 14, 16) (demonstrating that Aquila Sr., for more than 5 months, and despite Nationwide's sending him and counsel 10 letters requesting him to do so, failed to return basic "vehicle theft package" necessary to process the Claim; that Aquila Sr., for more than 5 months, and despite Nationwide's sending him and counsel 13 letters attempting to schedule a time and date for him to do so, failed (pursuant to the instructions of his counsel) to submit to an examination under oath, as he had a duty under the Policy to do; and that Dobrikovic, for more than 3 months and despite Nationwide's sending her 6 letters requesting her to do so, failed to provide a sworn statement (a request made by Nationwide which was justified in that she had one of the two keys to the Vehicle and Aquila Sr. had telephoned her shortly after the theft was discovered)).[11] Accordingly, to the extent that Aquila Sr. can in fact be read to assert within Count Two bad faith by Nationwide stemming from the delay in payment of the Claim, Nationwide is entitled to judgment

---

[11] We note, additionally, that the duration between the date the Claim was first made (September 27, 2005) and the date on which it was finally paid (May 12, 2006), a duration of less than eight months, is well within the time-frame generally accepted by courts within our jurisdiction as reasonable.  *See Williams*, 83 F. Supp. 2d at 572 (finding that fourteen month duration between date insurer had notice of claim and date of a vocational assessment did not constitute unreasonable delay or bad faith) (*and see* cases cited therein).

as a matter of law.

### 3.      Settlement of Claim for Less Than Full Amount

Nationwide also asserts that it is entitled to judgment as a matter of law upon this claim to the extent that Aquila Sr. asserts that the amount eventually paid by Nationwide upon the Claim constituted bad faith.  We are again mindful that where Nationwide can "show a reasonable basis for its actions," here its valuation of the Claim, it will meet its burden of demonstrating that there exists no genuine issue for trial and will thus be entitled to judgment as a matter of law. *Rock-Epstein*, 2008 U.S. Dist. LEXIS 76042 at *17; *see also Brown v. Progressive Ins. Co.*, 860 A.2d 493, 507-508 (finding plaintiff unable to show bad faith by clear and convincing standard where defendant insurer demonstrated a reasonable valuation position); *Terletsky*, 649 A.2d at 689 (finding that "reasonably based" settlement offers "did not constitute bad faith").

Nationwide asserts that it paid all amounts due to Aquila Sr. as a result of the Claim. Nationwide focuses first upon its payment of the Actual Cash Value of the Vehicle which, it asserts, was the proper measure of damage under the Policy.  (Doc. 75 at 21; *see also* Ex. 9 at NW-003 & NW-0012).  The specific amount paid was the $19,093.78 vehicle valuation, as determined by a 16 page report prepared by "CCC Valuescope," minus a $500.00 deductible, for a total payment of $18,593.78.  (Doc. 75 at 21; *see also* Ex. 17).  This amount, Nationwide asserts, exceeded the estimated repair cost of $17,702.42.  (Doc. 75 at 21; *see also* Ex. 18).

Aquila Sr., having failed to respond, provides no evidence to dispute that the Actual Cash Value was the proper measure of damage, no evidence to dispute the accuracy of the CCC Valuescope report, and no evidence challenging the reasonableness of Nationwide's reliance upon it.  Tellingly, he does not even provide a contrary assertion as to what he believes a proper valuation

would have been.  Independently, we are unable to find any reason to question the CCC Valuescope report or Nationwide's reliance upon it. We thus agree that Nationwide has provided sufficient evidence to demonstrate a reasonable basis for its valuation of the Claim and, thus, the absence of any genuine triable issue.

Nationwide next asserts that it paid any and all of Aquila Sr.'s expenses due under the Policy. (Doc. 75 at 23; *see also* Ex. 9, pg. NW-0005).  The Policy provided two categories of "Covered Expenses": "Auto Rental Expense" and "Travel Expense." (Doc. 75 at Ex. 9, pg. NW-0005).  With respect to auto rental expenses, the clear terms of the Policy provided coverage for the rental of a replacement auto for a maximum duration of the quickest of: 30 consecutive days, the date of repair, or the date of claim settlement.  (Doc. 75 at Ex. 9, pg. NW-0005).  Pursuant to that coverage, on September 27, 2005, Nationwide asserts, and at his deposition Aquila Sr. confirmed (*see* Doc. 75 at Ex. 2, pg. 29), that it in fact did authorize payment for the cost of Aquila Sr.'s vehicle rental for the 30 day maximum period.  (Doc. 75 at 23; *see also* Ex. 5, pp. 236, 204 and 194).  Pursuant to the clear terms of the Policy, Aquila Sr. was entitled to nothing more.  He provides nothing that would demonstrate otherwise.

With respect to travel expenses, the clear terms of the Policy provide for reimbursement of certain such expenses, but only where the loss "occur[s] more than 50 miles from [the insured's] home residence." (Doc. 75 at Ex. 9, pg. NW-0005).  Pursuant to that coverage, Nationwide asserts that Aquila Sr. was not entitled to reimbursement in that the loss (i.e. the theft of the Vehicle) occurred less than 50 miles away from Aquila Sr.'s home residence.  (*See* Doc. 75 at 24).  We agree, as we take judicial notice from our familiarity with the Philadelphia region that the distance between 700 Packer Avenue (the location where the Vehicle had been parked when stolen (*see* Doc. 75 at Ex.

5, pg. 301)) and 109 Friendship Road, Drexel Hill, Pennsylvania (Aquila Sr.'s home residence (*see*

Doc. 68 at ¶ 1)) is only 19.70 miles, well below the 50 mile limit.[12]  Plaintiffs provide no evidence

to dispute the 19.70 mile distance.  Pursuant to the clear terms of the Policy, Aquila Sr. was not

entitled to reimbursement for travel expenses and he provides nothing to demonstrate otherwise.[13]

To the extent that Aquila Sr. can be read to assert that Nationwide failed to reimburse him

for his "continue[d] paying [of] an insurance premium" on the Vehicle during the time that the

Investigation was ongoing (Doc. 68 at 5, ¶ 16), the assertion is belied by the evidence of record.  As

Nationwide points out, Aquila Sr., through his attorney, inquired as to whether he would be

reimbursed for his payment of those insurance premiums on May 1, 2006 (Doc. 75 at 24; *see also*

Ex. 5, pg. 52) and made a formal request for a refund of those payments on May 15, 2006 (Doc. 75

at 25; *see also* Ex. 21).  Nationwide asserts that it, in turn, issued to Aquila Sr. payment in the

amount of $1,578.30 on May 26, 2006 as compensation for all amounts owed as a result of those

premium payments, and attaches in support a photo-copy of the issued check.  (Doc. 75 at 25; *see*

*also* Ex. 21).  Nationwide also attaches a photo-copy of the check's reverse side, which shows that

Aquila Sr. signed it and presented it for deposit on June 1, 2006.  (Doc. 75 at Ex. 21).  Aquila Sr.

disputes neither the authenticity of the documents supporting Nationwide's assertions as to the actual

reimbursement of the premium payments nor the sufficiency of the amount actually paid, and we

---

[12] In support of its assertion, Nationwide attaches a photo-copy of a Mapquest.com printout measuring the distance from 700 Pattison Avenue and 109 Friendship Road, as 19.28 miles.  (Doc. 75 at Ex. 20).  700 Pattison Avenue, however, is the wrong starting point – the theft occurred at 700 *Packer* Avenue.  We arrive at the 19.70 mile distance by conducting our own independent Mapquest.com search, using 700 Packer Avenue as the starting point and 109 Friendship Road, Drexel Hill, Pennsylvania as the ending point.

[13] Tellingly, it appears to be the case that Aquila Sr. never even made a claim with Nationwide for travel expenses.  (*See* Doc. 75 at 23-24).

accept Nationwide's properly supported assertions as true. Aquila Sr. is unable to demonstrate that he was entitled to anything more.

Finally, to the extent that Aquila Sr. seeks compensation for "loss of time and efforts required to procure counsel, meet with counsel and prepare counsel with the facts necessary to provide counsel with information to his benefit," for "lost time from work," for "spent funds which he should not have had to expend and all the losses to him resulting therefrom" (Doc. 68 at 15, ¶ 49) and for a general "inconvenience" (Doc. 68 at 16, ¶ 50), Plaintiffs fail to cite, and we are unable to independently find, any Policy provision which arguably provides coverage for such items. As such, Aquilla Sr. is unable to demonstrate that he was entitled to compensation for them.[14]

We are thus satisfied that Nationwide has sufficiently demonstrated that it paid to Aquilla Sr. all amounts properly due to him under the Policy. Aquila Sr. fails to provide any evidence demonstrating otherwise. We are satisfied that Nationwide has demonstrated a "reasonable basis for its actions" and is thus entitled to judgment as a matter of law to the extent that the claim is predicated upon Nationwide's settlement of the Claim for an insufficient monetary amount. *Rock-Epstein*, 2008 U.S. Dist. LEXIS 76042 at *17.

### 4.    Manner in Which the Investigation was Conducted

We finally understand Aquila Sr. to assert within the second amended counterclaim that the manner in which Nationwide undertook the Investigation (e.g. by making inappropriate comments and inferences about Aquila Sr.) constituted bad faith. We note in this respect that the Pennsylvania Superior Courts have determined that "the broad language of Section 8371 was designed to remedy

---

[14] Once again, it appears to be the case that Aquila Sr. never even made a claim with Nationwide for such expenses. (*See* Doc. 75 at 23-24).

all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation" and thus concluded that an "action for bad faith may also extend to the insurer's investigative practices." *Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 92 (Pa. Super. Ct. 2007) (quoting *Hollock v. Erie Insurance Exchange*, 842 A.2d 409, 415 (Pa. Super. Ct. 2004)).

As set out above, even where, as here, the nonmoving party fails to respond to the motion, summary judgment is inappropriate unless the moving party demonstrates an absence of a genuine issue of material fact. *See Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190, 1194-95 (3d Cir. 2002). Aquila Sr., within the second amended complaint, has asserted that Nationwide, through Marakovits, acted to intimidate Aquila Sr, made insinuations to others that Aquila Sr. had engaged in criminal activity, told others that he had a "shady character, and generally sought to "cause dissension" between Aquila Sr. and Dobrikovic. (*See supra* at 3-4). These allegations, while no longer relevant to the time-barred defamation cause of action, remain relevant to Aquila Sr.'s bad faith claim, and specifically with regard to the manner in which Nationwide, through Marakovits, is alleged to have conducted the Investigation. While Aquila Sr. has provided no evidence to date to support these allegations, neither has Nationwide addressed them. Nationwide is thus unable, at this stage, to demonstrate an absence of a genuine issue of material fact. *See Reed*, 312 F.3d at 1194-95. This component of the bad faith claim must be determined at trial. To the extent that certain evidentiary issues may arise as a result of our partial grant of summary judgment, such issues will be resolved at that time.

An appropriate order follows.

24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTIAN AQUILA, and            :      CIVIL ACTION
MELINA DOBRIKOVIC-AQUILA         :
and CHRISTIAN AQUILA, JR., a minor :
                                 :
        Plaintiffs               :
                                 :
        v.                       :      NO.  07-2696
                                 :
NATIONWIDE MUTUAL                :
INSURANCE COMPANY                :
                                 :
        Defendant.               :

**ORDER**

AND NOW, this     15th        day of December, 2008, upon consideration of Defendant

Nationwide Mutual Insurance Company's "Motion for Summary Judgment Pursuant to F.R.C.P.

56(b)" dated October 3, 2008 (Doc. 75) and noting Plaintiffs' failure to respond, **IT IS HEREBY**

**ORDERED THAT** the motion is **GRANTED IN PART**, consistent with the accompanying

memorandum opinion.

BY THE COURT:


 /s/ David R. Strawbridge
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE